UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Bruce Tunison, | ) | Civil Action No.  5:24-1330-RMG-KDW |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Martin O'Malley, Commissioner of Social Security, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act"). For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further administrative action.

I.      Relevant Background

A.      Procedural History

On March 23, 2022, Plaintiff protectively filed an application for DIB alleging a disability onset date of December 2, 2016. Tr. 38, 281-82. His application was denied initially and upon reconsideration. Tr. 113, 122. Plaintiff requested a hearing by an Administrative Law Judge ("ALJ"), Tr. 146-47, and on December 13, 2022, a hearing was held before ALJ Ronald Fleming. Tr. 78-112. ALJ Fleming held a second, supplemental hearing on September 6, 2023. Tr. 54-77. On October 25, 2023, the ALJ issued an unfavorable decision finding Plaintiff was not disabled. Tr. 35-48. On December 19, 2023, Plaintiff requested review of the decision by the Appeals Council. Tr. 274-77. The Appeals Council denied the request for review on January 22, 2024, making the ALJ's October 25, 2023 Decision the final decision for purposes of judicial review. Tr. 1-5. Plaintiff brought this

action seeking judicial review of the Commissioner's decision in a Complaint filed on March 19, 2024. ECF No. 1.

B.    Plaintiff's Background

Born in April 1969, Plaintiff was 47 years old as of his alleged onset date of December 2, 2016, and 51 years old as of his date last insured ("DLI") of December 31, 2020. Tr. 322. In his form Disability Report – Adult dated April 22, 2022, Plaintiff indicated that he completed four or more years of college in 1991. Tr. 327. Plaintiff listed his past relevant work ("PRW") as Army clerk (May 2002-Nov. 2004) and claim assistant for the Department of Veterans Affairs (Sept. 2009-June 2015). Tr. 327-28. Plaintiff indicated he stopped working on December 2, 2016, because of his medical conditions. Tr. 326. Plaintiff listed the following conditions that limit his ability to work: cervical spine, fibromyalgia, IBSD, hypertension, sleep apnea, headaches, depression, anxiety, and PTSD. Tr. 326. Plaintiff indicated his height was 6'2" and his weight was 230 pounds. *Id.*

C.    First Administrative Hearing

On December 13, 2022, Plaintiff appeared with counsel for his administrative hearing before ALJ Ronald Fleming in Columbia, South Carolina. Tr. 78. VE Brenda Dumas also appeared and testified. *Id.* After confirming Plaintiff's onset date of December 2, 2016, the ALJ outlined Plaintiff's impairments as follows:

> We have PTSD, depression, obstructive sleep apnea, fibromyalgia, headaches, history of lumbar laminectomy at L4/L5 and L5/S1, anxiety, hypertension, irritable bowel syndrome, DJD of the bilateral hips with arthroscopic surgery to the left hip x3 with subsequent hip replacement, hiatal hernia, chronic kidney disease, umbilical hernia with surgical repair, history of arthroscopic surgery to the left knee, obesity, vitamin D deficiency. They say DVD of the cervical spine but in the files, I didn't see any radiological evidence [of] that. Hyperlipidemia or high cholesterol, hyperaldosteronism, hypokalemia and non-traumatic rhabdomyolysis.

Tr. 83. Plaintiff's counsel confirmed those were all the impairments. *Id.*

2

1. Plaintiff's Testimony

In response to questions from the ALJ Plaintiff confirmed that he was 53 years old, 6'2" tall, weighed 255 pounds, right-handed, and was married with stepchildren. Tr. 83-84. Plaintiff testified that he lived in a house with his wife and his income included VA disability from a 100% VA rating, and a "small stipend from being medically retired from Federal Service." Tr. 84. Plaintiff confirmed that he has a driver's license and drives "[m]aybe two to four days a week." *Id.* Plaintiff also confirmed that he has a four-year college education and is able to pay bills. Tr. 85. He testified that he has not worked anywhere since December 2, 2016, but because of the medical retirement process from federal service it took several years before he was able to file a claim for Social Security disability. Tr. 85-86. Plaintiff testified that he last worked for the Department of Veterans Affairs in Milwaukee, Wisconsin assisting with claims processing. Tr. 86. He confirmed that it was a desk job, and the most he would lift would be claims files that could weigh between 20-25 pounds. *Id.* He stated that he started working on that job in 2009; prior to that he worked part-time for RS Legacy Corporation and Allory Toxicology Services/Kroll Inc. Tr. 87. Plaintiff confirmed that he worked full-time for Alltell in 2007 and 2008 while his VA benefits were still being processed. *Id.* Plaintiff indicated he was not sure how long he worked for Alltell and noted that he worked for more than one cell phone company. Tr. 88. Plaintiff explained that he "was medically separated in 2004 from the military and from that point on was when the process of determining VA benefits started and it took six years from start to finish." *Id.* Plaintiff testified that over the course of those years he worked when he could to maintain his household. *Id.* Plaintiff confirmed that in 2005 he worked at Ritz Camera Center for six months selling photography equipment and earned about $11,000. *Id.* He stated that at that job he lifted "maybe up to 45 pounds." Tr. 88-89. Prior to that job he was in the Army doing logistics consisting of "in-processing of supplies, supply deliveries." Tr. 89. Plaintiff stated that

3

he had to lift "no more than about 50 pounds." *Id.* Plaintiff confirmed that he had not worked any jobs from 2001 to 2016 making more than $30,000 a year other than VA claims processor, camera shop salesperson, and Army logistics. *Id.* The ALJ indicated to the VE that those would be the only jobs under consideration. *Id.*

Plaintiff testified that currently he was not on medication for his diagnosed PTSD, depression, and anxiety. Tr. 89-90. He indicated that the "last medication [he] was on for that was gabapentin, but the side effects were too negative." Tr. 90. Plaintiff stated that he was not currently seeing a counselor because when he got to South Carolina in 2000, the VA was not seeing patients in person, so he had one telehealth conference call with his primary doctor. *Id.* Plaintiff testified that the current year was the first time he was physically able to go to appointments and he was "playing catch-up with the appointments now." *Id.* Plaintiff testified that when in Milwaukee, Wisconsin in 2017 he saw a counselor twice a week for his mental health issues; and he last took medications for his mental health issues in 2017. *Id.* Plaintiff testified that he had never been hospitalized overnight for PTSD, depression or anxiety. Tr. 90-91. Plaintiff stated that he has been managing his symptoms with certain types of music, and an app on his phone called Calm, which he stated has been working to "some degree." Tr. 91. Plaintiff testified that two or three times a week he has panic attacks that last 30 minutes. He stated that they "tend to occur at night" and he sleeps with a CPAP machine so "it's just a matter of pulling [his] mask off and then just sitting up for a while, for a little while, and breathing normally while awake." *Id.* He stated that the panic attacks are caused by "bad dreams or the actual recall of the traumatic events like the accident [he] was in." *Id.* Plaintiff testified that in 2003 he was a passenger in a vehicle that was involved in an accident. Tr. 92. Plaintiff recounted that "[w]hile returning from one military installation to the other, the driver of the government vehicle drove into a blizzard on a highway in Kentucky, apparently too fast for the conditions. The van spun off

the road, went down an embankment, hit the side of a mountain, and flipped over five times." *Id.* Plaintiff testified that he was admitted to the hospital and was treated for bruising, swelling in the left knee (for which he eventually had to have knee surgery), cuts, lacerations, and internal stomach problems due to the pressure of the lap belt while the vehicle was rolling over. Tr. 92-93. The ALJ noted that those records were not in the file and asked Plaintiff's attorney to try to get them. Tr. 93. Plaintiff testified that he was diagnosed with fibromyalgia by a doctor at a civilian clinic in Chicago. He stated that he believed it was a rheumatologist who was consulting with an orthopedic doctor, and that information was provided to the VA hospital in Milwaukee that continued to provide him treatment and medications. Tr. 93-94. Plaintiff stated that he was originally prescribed gabapentin for his fibromyalgia but was unable to stay on it due to side effects. Tr. 94. He stated that it made him "feel very sluggish from a mental and physical standpoint" and he was in a "depressive type mood." *Id.* Plaintiff testified that it did not help with his fibromyalgia. *Id.* Plaintiff stated that the fibromyalgia primarily affects his arms, and when he starts moving around it agitates other parts of his body. *Id.* Plaintiff described it as follows: "Just basically, I feel like I have pain running through my veins instead of blood. I can feel it all throughout my arms and hands and fingers and it's very achy and painful.   It's predominantly achy, but it does manifest sharp pains as well at times." Tr. 95. Plaintiff stated that he has that pain every day, and on a ten-point scale he would rate the pain at eight to nine. *Id.* He stated that he has tried both over-the-counter and prescribed pain medication but he is not taking anything now because he is already on nine prescribed medications that impact his kidney functioning. *Id.* Plaintiff testified that he has headaches three-to-five times a week that last anywhere from 30 minutes to four or five hours. Tr. 96. He stated that he does not have prescribed medication for his headaches and has tried over-the-counter medication "but it tends not to be

effective because the headaches seem to stem from [his] neck and more so end up being classified as tension headaches more than anything else." *Id.* Plaintiff confirmed that he had surgery on his L5/S1 but less than a year after the surgery his pain started resurfacing. *Id.* He stated that x-rays and MRIs showed that his L4 and L5 are "in contact and they rub and cause a painful popping sensation." *Id.* Plaintiff stated that he had an MRI this year at Resurgens Orthopaedics in Covington, Georgia with the same doctors who did his back surgery and hip replacement. Tr. 96-97. The ALJ noted that the MRI was discussed in Exhibit 9F from Lake Carolina Pain and Spine, but it was not the actual MRI report. He asked the attorney to obtain the report. Tr. 97. Plaintiff testified that even as he was sitting in the hearing, he was having pain in his lower back that he rated as a nine or ten. *Id.* Plaintiff stated that he took pain medications for his back briefly, but they were not working. He stated that he tried epidural injections from the doctor at Lake Carolina Pain and Spine, "but the administering of them were more painful than helpful. And the effects of the injections were not positive." Tr. 97-98. Plaintiff stated that other than his hip feeling "achy" in bad weather, his hip is fine. Plaintiff noted that the pain from his back radiates into his legs in a "sciatica-like pain" making it hard to differentiate the location of the pain, although it tended to be in the same region. Tr. 98. Plaintiff testified that he sees a nephrologist for his diagnosed kidney disease and has a follow-up appointment scheduled to review an ultrasound and CT scan done two weeks earlier. *Id.* The ALJ asked Plaintiff's counsel to get those records as well. *Id.* Plaintiff stated that his nephrologist is Stephen Osaguona with Palmetto Kidney and Hypertension, and the ALJ asked for those records so that he could see Plaintiff's current creatinine levels. Tr. 99. Plaintiff confirmed that he is not on dialysis. *Id.* Plaintiff testified that he has not had problems with his left knee since his arthroscopic surgery other than aches due to bad weather. He stated that, according to his doctors, he has "quite a bit of arthritis going

on, especially in the lower back and hip as well." *Id.* Plaintiff testified that he does not have full range of motion in his neck, and the base of his neck is painful, and he would rate it at a seven on a ten-point scale. Tr. 100. Plaintiff stated that he had an MRI of his neck between 2002 and 2004 when he was on active military duty, and he was diagnosed with degenerative discs. *Id.* He indicated that his neck may have been looked at again between 2004 and 2006 at the VA in Richmond, Virginia. *Id.* Plaintiff stated that when his most recent CT scan was done for his nephrologist it may have included his cervical spine, but he had no recent x-rays of his cervical spine. Tr. 100-01.

Plaintiff testified that he can sit for 15-20 minutes before needing to stand up, and he can stand five-to-ten minutes before having to sit down. Tr. 101. He stated he can walk for five-to-ten minutes before needing to stop and rest, and he can lift and carry "[m]aybe 25 pounds." Tr. 101-02. Plaintiff stated that he would have to sit down to reach a pencil dropped on the floor, he could not kneel on one knee without extreme difficulty, and he could not squat or crawl. Tr. 102. He testified that he can manage his self-care, but that it is "getting increasingly harder with the baths and showers and things like putting [on] socks and shoes." *Id.* Plaintiff stated that he rarely cooks, and he is able to wash dishes if he sits in one of his counter-height stools in front of the sink. *Id.* He stated that he does not vacuum or sweep, does not do laundry, and drives his wife to the grocery store and sits in the car while she shops. Tr. 103. Plaintiff stated that he does not do activities outside of the house like going to church, visiting family and friends, or going out to eat. *Id.* When asked to describe a typical day, Plaintiff stated that he first uses the bathroom, then takes some of his medications until he can get something to eat so he can take the rest of his medications. He stated that if he is downstairs he spends most of the day on the couch in his family room, and if he is upstairs he sits in the recliner and watches television. *Id.*

In response to questions from his attorney, Plaintiff testified that his sleep is affected by his impairments because the pain in his back does not allow him to maintain one position for very long. Tr. 104. He stated that the pain sometimes wakes him out of his sleep, and he is unable to go back to sleep; he also has "nocturia, which is said to be connected to the sleep apnea as well, which means somewhere between 10 to 15 trips to the bathroom to urinate throughout the night." *Id.* Plaintiff stated that condition was not known until he went to the nephrologist. *Id.* He stated that he uses his CPAP every night, and he can tolerate it other than when his bad dreams cause him to panic and take it off. *Id.* Plaintiff stated that he is awakened with nightmares three-to-five times a week and he estimated that he gets three hours of sleep a night. Tr. 105. He stated that because of his pain, "whatever sleep [he] get[s] during the day might amount to an hour or two at the most and in short catnap intervals." *Id.* Plaintiff testified that throughout the day he falls asleep without intending to do so, and that was a problem at work prior to being medically separated from the VA. Plaintiff stated that when he was working at the computer, he "would often nod off and fall asleep and have to be awakened by [his] supervisor." *Id.* Plaintiff testified that he has difficulty concentrating, and when he tries to "put a thought or a sentence together in [his] head, it's constantly interrupted . . . by these short jabs of pain." Tr. 106. He stated that his concentration issues caused him performance issues when he was working because it would take him longer than normal to complete tasks, and that affected his claims quota. *Id.* Plaintiff stated that he was given special accommodations at his last job so that he was allowed to leave early if his pain got too bad and, if needed, he could call in the next day without it being a problem with his supervisors. Tr. 107. Plaintiff stated that he "far exceeded" his leave limits. *Id.*

  2. VE's Testimony

The VE summarized Plaintiff's past work as claims processor/claims clerk I, Dictionary of Occupational Titles ("DOT") number 241.362-010, classified sedentary performed as light, SVP 4, semi-skilled; photographic supplies and equipment salesperson, DOT number 277.357-050, light, SVP 5, skilled; and materials handler, DOT number 929.687-030, classified heavy performed as medium, SVP 3, and semi-skilled. Tr. 108. The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education and past job experience with the following limitations:

> Further assume this hypothetical individual would be limited to light work with occasional climbing of ramps and stairs, no climbing of ladders, ropes, or scaffolds. Occasional balancing and stooping, no kneeling, crouching, or crawling. They would need to avoid concentrated exposure to dangerous machinery and heights. They would be further limited to occupations requiring no more than simple, routine repetitive tasks not performed in a fast-paced production environment, involving only simple work-related instructions and decisions, and relatively few workplace changes. They would be further limited to occupations requiring no more than occasional interaction with coworkers and members of the general public. The hypothetical individual would be able to maintain concentration, persistence, and pace for two-hour intervals.

Tr. 109. The ALJ asked the VE if the hypothetical individual could perform any of Plaintiff's past relevant work. The VE testified in the negative, but noted the following exemplar jobs that would be available: housekeeping/cleaner, DOT number 323.687-014, light, SVP 2, unskilled, 400,000 nationally; sampler, DOT number 549.587-018, light, SVP 2, unskilled, 50,000 nationally; and checker, DOT number 221.587-010, light, SVP 2, unskilled, 69,000 nationally. Tr. 109-10.

For his second hypothetical, the ALJ asked the VE to consider the same limitations as in the first hypothetical except the individual would be limited to sedentary work. Tr. 110. The VE testified there would be work the individual could perform and identified the following positions: table worker, DOT number 739.687-182, sedentary, SVP 2, unskilled, 20,000 nationally; folder,

DOT number 685.687-014, sedentary, SVP 2, unskilled, 20,000 nationally; and gauger, DOT number 712.687-018, sedentary, SVP 2, unskilled, 20,000 nationally. *Id.*

For his third hypothetical, the ALJ asked the VE to consider the same limitations as in the second hypothetical "except take out the part where I said they could maintain concentration, persistence, and pace for two-hour increments and add to it, due to the impairments and symptoms discussed herein, the hypothetical individual would be off task 20% of the workday and would miss three days' work per month." Tr. 110. The VE testified that in her opinion "either one of those or in combination would exceed what would be tolerated by employers and would preclude full-time work." *Id.*

Plaintiff's attorney had no follow-up questions. *Id.* The VE testified that her testimony was consistent with the DOT except that the DOT does not address climbing ladders versus stairs, and it does not discuss off-task behavior or absenteeism. She stated that for those types of issues she based her testimony on her professional experience, and training and education in the field of rehabilitation. Tr. 111.

The ALJ indicated that he wanted the records from the hospital where Plaintiff had the car accident, the records from the nephrologist including the CAT scan and ultrasound, and the most recent MRI of the lumbar spine. Tr. 111. The ALJ stated he would send Plaintiff to get cervical x-rays, a physical consultative examination, and psychological consultive examination. *Id.*

With nothing further, the hearing closed. Tr. 112.

D.     Second Administrative Hearing

Plaintiff appeared with counsel for his second supplemental administrative hearing before ALJ Fleming on September 6, 2023, in Columbia, S.C. Tr. 54. VE Ryan Farrell also appeared and testified. *Id.*

    1.  Plaintiff's Testimony

In response to questions from his attorney regarding any changes in his medical condition, Plaintiff testified that his "ability to get around has become increasingly difficult to the point where the doctors at the VA have issued [him] both this rollator [he is] using today as well as an actual manual wheelchair." Tr. 59. Plaintiff stated that the size of the venue determines which one he uses. He also noted that he is waiting for the shipment of a shower chair because his ability to walk and stand "has been further compromised due to the unresolved issues pain-wise between the lower back problems as well as the fibromyalgia." *Id.* Plaintiff testified that his pain is now so intense that he is no longer able to sleep in a bed and spends most of his time in a reclining chair. *Id.* He stated that his "overall ability to, to complete a lot of different tasks that require [his] physical movement are just reduced." Tr. 59-60. Plaintiff testified that he uses the rollator on the first floor of his house where there are hardwood floors, and he uses a stationary walker and a cane on the second floor. He stated that they have started looking for another house with "either one level or with the primary living on the main floor because the stairs have just become too much of a task and a hazard for [him]." Tr. 60. Plaintiff stated that the shower chair is needed because the process of hygiene has become difficult and exhausting. *Id.* Plaintiff stated that he can sit for maybe 15 minutes before needing to change his position, and he is able to walk slowly for maybe ten minutes using the rollator so that he can sit down and take breaks. Tr. 61. He confirmed that he uses an assistive device whenever he is walking. *Id.* Plaintiff stated that he is able to stand for five minutes before needing to sit down on the rollator. *Id.* Plaintiff testified that to make the pain "bearable" he sits in a reclining position the majority of the

day except for "maybe three to five hours tops." *Id.* Plaintiff testified that he gets about three hours of sleep at night and requires naps during the day. Tr. 62. He stated that he naps for four hours a day broken into 30–60-minute intervals throughout the day. *Id.* Plaintiff testified he is able to lift about 20 pounds, and confirmed his use of an assistive device prevents him from carrying anything of any weight. *Id.* Plaintiff indicated pain in his bilateral shoulders that has worsened since the last hearing and affects his reaching. *Id.* He testified that he is not taking any additional medications since the last hearing, but on occasion when the pain in his extremities is "too much" he will take acetaminophen. Tr. 62-63. Plaintiff noted that his rheumatologist wanted to prescribe another medication, but that even with the manufacturer discount cards, he could not afford it. Tr. 63. Plaintiff could not recall the name of the medication and does not know if it would work or not. *Id.* Later in his testimony, Plaintiff recalled the medication the rheumatologist was trying to prescribe was called Savella. Tr. 70. Plaintiff stated that based on his kidney disease, he has been given limitations on the medication he is able to take. Tr. 63. He noted that last week his endocrinologist removed lisinopril from his list of medications and is experimenting with increasing the dosage on a different medication to treat his hypertension. *Id.*

Plaintiff testified that his decreased mobility since the last hearing has affected his activities of daily living. Tr. 64. As examples, Plaintiff testified that he cannot participate in grocery shopping, and doing anything aside from being in his recliner and watching TV has become too difficult. He noted that he is not able to interact with his young grandchildren because he cannot move around. *Id.* He testified that the amount of time spent driving varies and most of his driving is to medical appointments. Tr. 64-65. Plaintiff testified that he is still able to wash dishes occasionally by sitting on a stool at the sink, but he cannot do yardwork. Tr. 65.

12

In response to questions from the ALJ, Plaintiff testified that prior to December 31, 2020, his grocery shopping consisted primarily of driving his wife to the store; but, depending on his pain levels he could push the cart or use a motorized cart in the store. Tr. 65-66. Plaintiff testified that prior to December 31, 2020, he was not using a rollator or walker, but he stated that he has been "using the cane on and off all the way going back to 2004." Tr. 66. Plaintiff explained that he used a cane because he had "knee surgery, four hip surgeries to include the replacement, and a back surgery, also, which, of course, mandated that [he] used assistive devices for . . . long periods of time. *Id.* Plaintiff testified that prior to December 31, 2020, he was doing housework that included "[d]oing dishes, maybe laundry from time to time, dusting, especially areas that were up high being considerably taller than [his] wife is. Just sweeping the floor, running the vacuum . . . to the extent that [he] could." Tr. 67. Plaintiff stated that prior to December 31, 2020, he could sit for an hour before needing to stand up, stand for 25 minutes before needing to sit down, and could walk for about ten minutes before needing to stop and rest. *Id.* He stated that at that time he could lift and carry "[m]aybe 30" pounds. Tr. 67-68. Plaintiff stated that prior to December 31, 2020, his back would prevent him from being able to retrieve a pencil from the floor from a standing position. Tr. 68. He testified that prior to that date he could not have knelt on one knee, squatted, or crawled. *Id.* Plaintiff stated that prior to that date he did not have problems with self-care and did not need assistance with going to the bathroom, taking a shower or bath, or with getting dressed. *Id.*

2.  VE's Testimony

The ALJ asked Plaintiff some additional questions regarding his past relevant work and noted that he would now include Plaintiff's work at Alltel because based on Plaintiff's testimony that he earned about $2,100 a month, he was at SGA [substantial gainful activity]. Tr. 69-71. The VE agreed with the job classifications made by VE Dumas at the December 2022 hearing, and he added the

classification for the Alltel job as sales representative communication equipment, DOT number 271.257-010, SVP 6, light strength. Tr. 73.

The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and past job experience with the following limitations:

> Further assume this hypothetical individual would be limited to light work with occasional climbing of ramps and stairs. No climbing of ladders, ropes, or scaffolds. Occasional balancing and stooping, no kneeling, crouching, or crawling. They would need to avoid concentrated exposure to dangerous machinery and heights. They'd be further limited to occupations requiring no more than simple, routine, repetitive tasks not performed in a fast-paced production environment, involving only simple work-related instructions and decisions, and relatively few workplace changes. They'd be further limited to occupations requiring no more than occasional interaction with coworkers and members of the general public. The hypothetical individual would be able to maintain concentration, persistence, and pace for two-hour increments.

Tr. 73. The VE testified that the hypothetical individual would be unable to perform any of Plaintiff's past relevant work. Tr. 73-74. The ALJ noted that at the prior hearing the VE identified jobs that could be performed under the hypothetical as housekeeper, sampler, and checker. Tr. 74. The VE disagreed that housekeeper and sampler would be options as "both identified as occasional crouching[.]" *Id.* The ALJ discarded those two jobs, and the VE provided two other representative examples of marker, DOT number 209.587-034, SVP 2, light, with 136,000 nationally; and routing clerk, DOT number 22.687-022, SVP 2, light, with 117,000 nationally. Tr. 75.

For his second hypothetical the ALJ asked the VE to consider the same limitations as in hypothetical #1, except limited to sedentary work. Tr. 75. The VE identified the jobs of addresser, DOT number 209.587-010, SVP 2, sedentary, with approximately 15,000 nationally; document preparer, DOT number 249.587-018, SVP 2, sedentary, with approximately 15,000 nationally; and tube operator, DOT number 239.687-014, SVP 2, sedentary, with approximately 3,500 nationally. *Id.*

14

For his final hypothetical the ALJ stated it would be the "same as hypothetical #2 except take out the part where I said they could maintain concentration, persistence, and pace for two-hour increments, and add to it due to impairments and symptoms discussed herein, the hypothetical individual will be off task 20 percent of the workday and would miss three days' work per month." Tr. 75-76. The VE testified that there would be no work the hypothetical individual could perform. Tr. 76.

Plaintiff's attorney had no questions for the VE. Tr. 76. The VE testified that his testimony did not have any conflicts with the DOT but stated:

> some areas supplemental to where you discussed differences in the climbing of ladders, ropes, and scaffolds or climbing ramps and stairs, simple, routine, and repetitive tasks, simple instructions, changes in a work environment, interactions with coworkers and the general public, off task behavior, and absences in a work environment. Those areas are not addressed, are not directly addressed in the DOT and related publications and would be based on my education, experience, and training.

*Id.* With nothing further, the hearing closed. Tr. 77.

II.     Discussion

A.     The ALJ's Decision

In his October 25, 2023 Decision, ALJ Fleming made the following findings of fact and conclusions of law:

> 1.   The claimant last met the insured status requirements of the Social Security Act on December 31, 2020.
>
> 2.   The claimant did not engage in substantial gainful activity during the period from his alleged onset date of December 2, 2016 through his date last insured of December 31, 2020 (20 CFR 404.1571 *et seq.*).
>
> 3.   Through the date last insured, the claimant had the following severe impairments: fibromyalgia, post traumatic stress disorder, depression, anxiety, history of L4-S1 laminectomy secondary to degenerative disc disease, history of arthroscopic surgery to the left hip and mass excision with subsequent left hip replacement all secondary to osteoarthritis, degenerative disc disease of the cervical spine (20 CFR 404.1520(c)).

15

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except occasional climbing of ramps and stairs; no climbing of ladders ropes and scaffolds; occasional balancing and stooping; no kneeling, crouching and crawling. The claimant must avoid concentrated exposure to dangerous machinery and heights. The claimant is further limited to occupations requiring no more than simple routine repetitive task[s], not performed in a fast paced production environment, involving only simple work related instructions and decisions and relatively few work place changes. The claimant is further limited to occupations requiring no more than occasional interaction with co-workers and members of the general public. The claimant will be able to maintain concentration persistence and pace for 2 hour increments.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on April 13, 1969 and was 51 years old, which is defined as a younger individual age 18-49, on the date last insured. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules support a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from December 2, 2016, the alleged onset date, through December 31, 2020, the date last insured (20 CFR 404.1520(g)).

Tr. 40-41, 43, 46-48.

    B.    Legal Framework

    1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings; (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court

must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that the conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.     Analysis

Plaintiff alleges that (1) the ALJ failed to perform a proper listing analysis, (2) the ALJ erred in his findings regarding Plaintiff's non-severe impairments, (3) the ALJ failed to properly consider Plaintiff's diagnosis of chronic kidney disease, (4) the ALJ failed to fully develop the record related to Plaintiff's spine impairment, and (5) the ALJ erred in failing to acknowledge or assign weight to medical opinions in the VA disability rating records. Pl.'s Br. 1, ECF No. 10.

1.     Listings Analysis

The Social Security regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Social Security Administration ("SSA") considers disabling without the need to assess whether there are any jobs a claimant could do. The SSA considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria

of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3). ¹

a.   ALJ's Consideration of Plaintiff's Fibromyalgia

Plaintiff alleges that, other than noting "[f]ibromyalgia is considered pursuant to SSR 12-2p[,]" the ALJ failed to properly analyze his fibromyalgia "alone or in combination with Plaintiff's other impairments." Pl.'s Br. 9. The Commissioner argues that Plaintiff "fails to set forth any listings that his fibromyalgia supposedly equaled. Nor does he point to any evidence that the ALJ should have considered." Def.'s Br. 11, ECF No. 13. The Commissioner contends that Plaintiff's "passing reference unaccompanied by any argument is insufficient to preserve an argument with respect to the ALJ's step three analysis of Plaintiff's fibromyalgia." *Id.* In response, Plaintiff argues that the ALJ's failure to analyze his fibromyalgia "rendered his decision unreviewable on its face" and Plaintiff did not waive this argument. Pl.'s Reply 4, ECF No. 14.

"Although there is no medical listing for fibromyalgia, Titles II and XVI of SSR 12-2p provides guidance on how the Commissioner develops evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how to evaluate fibromyalgia in disability claims and continuing disability reviews." *Smith v. Colvin*, No. 2:14-cv-00042, 2015 WL 7571946, at *7 (W.D. Va. Nov. 24, 2015). SSR 12-2p defines fibromyalgia as a "complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2p, 2012 WL 3104869, at *2. SSR 12-2p also explains

how the Commissioner considers fibromyalgia in the five-step sequential evaluation process. Relevant here, SSR 12-2p says the following about the RFC assessment: "For a person with fibromyalgia, we will consider a longitudinal record whenever possible because the symptoms of fibromyalgia can wax and wane so that a person may have 'bad days and good days.'" *Id.* at *6.

In addition, the Fourth Circuit has recognized that "[f]ibromyalgia symptoms are entirely subjective [and t]here are no laboratory tests for the presence or severity of fibromyalgia." *Arakas v. Commissioner*, 983 F.3d 83, 91 (4th Cir. 2020). Indeed, "[p]hysical examinations [of patients with fibromyalgia] will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." *Id.* at 96 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 108–09 (2d Cir. 2003)). Accordingly, "ALJ's may not rely on objective medical evidence (or the lack thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of fibromyalgia . . .. If considered at all, such evidence— along with consistent trigger-point findings—should be treated as evidence *substantiating* the claimant's impairment." *Id.* at 97–98 (emphasis in original).

Here, the ALJ determined at Step Two that Plaintiff's fibromyalgia was a severe impairment and was "considered per SSR 12-2p." Tr. 40-41. In his discussion of Plaintiff's residual functional capacity ("RFC"), the ALJ noted Plaintiff's hearing testimony that he was "diagnosed with fibromyalgia, and took gabapentin, but the side effects caused him to discontinue it. The fibromyalgia is widespread and affects anything he is doing with his arms." Tr. 44. The ALJ further noted that "[a]lthough the claimant testified that his fibromyalgia was diagnosed at a private clinic, there are no records substantiating this, and the consultative examination at Exhibit 18F noted no real joint trigger points." Tr. 45. Exhibit 18F is the report from a January 28, 2023 orthopedic examination of Plaintiff

21

completed by Dr. Jeremy Head. Tr. 1265-76. Dr. Head diagnosed Plaintiff with back pain and with

fibromyalgia. Tr. 1267. He noted the following:

> Fibromyalgia: with diffuse, sharp pain. Difficult to quantify with physical exam findings. No exquisite point tenderness at time of exam though fibromyalgia can wax and wane. May be more fully be evaluated with psychiatric consult as mood/stresses can affect our perception of pain as well as the severity of fibromyalgia but diagnosis/degree of severity would likely be largely subjective even with in depth evaluation.

*Id.* Although, as the ALJ stated this exhibit did not note "real joint trigger points," Dr. Head indicated

fibromyalgia was difficult to quantify with exam findings. Further, even though he found no point

tenderness *at the time of the examination*, Dr. Head noted that fibromyalgia can wax and wane.

SSR 12-2p sets forth how fibromyalgia should be evaluated in determining disability using

the five-step sequential evaluation process. 2012 WL 3104869 at *5-6. Here, at Step Two the ALJ

determined Plaintiff's fibromyalgia was a severe impairment. At Step Three, the ALJ determined that

Plaintiff's combined physical impairments did not meet or medically equal impairments in Listings

1.15, 1.16, 1.17, or 1.18, and his mental impairments did not meet or medically equal Listings 12.04,

12.06, and 12.15. Tr. 41-42. Aside from his finding fibromyalgia to be a severe impairment and noting

that he considered it per the Ruling, there is no indication that the ALJ considered Plaintiff's

fibromyalgia specifically during his Step Three analysis. SSR 12-2p indicates that fibromyalgia

cannot meet a listing in Appendix 1 because fibromyalgia is not a listed impairment. 2012 WL

3104869 at *6. Therefore, the analysis should be to "determine whether [fibromyalgia] medically

equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it

medically equals a listing in combination with at least one other medically determinable impairment."

*Id. If* the ALJ conducted this analysis per SSR 12-2p, he did not provide this analysis in his decision.

*Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015) (finding that "[b]ecause the ALJ's opinion fails

to provide any explanation connecting his determination to that of [the claimant's] failure to meet the

listing impairment, the ALJ's analysis insufficient."). Additionally, despite finding Plaintiff's fibromyalgia to be a severe impairment, in his RFC discussion the ALJ seems to question Plaintiff's fibromyalgia diagnosis. Tr. 45. The ALJ's decision is unreviewable on this issue as the court is unable to follow the ALJ's reasoning as to Plaintiff's fibromyalgia impairment based on the discussion provided—or not provided—in his written decision. The ALJ failed to build a logical bridge between his findings regarding Plaintiff's fibromyalgia and conclusions that it did not meet or medically equal a listed impairment. Accordingly, the undersigned is unable to evaluate whether the ALJ's findings are supported by substantial evidence and recommends that the Commissioner's decision be reversed and remanded for further consideration of the evidence under the analysis set forth in SSR 12-2p.

### b. ALJ's Consideration of Listing 1.17

Plaintiff argues the ALJ erred in the basis for his finding that Plaintiff's impairments did not meet Listing 1.17. Pl.'s Br. 10. Plaintiff asserts the ALJ incorrectly found "that 'the record does not show a history of reconstructive surgery nor surgical arthrodesis of a major weight bearing joint.'" *Id.* Plaintiff contends the ALJ misstated the medical record. *Id.* at 11.

Listing 1.17 applies to impairments or musculoskeletal disorders resulting from reconstructive surgery or surgical arthrodesis of a major weight-bearing joint. Major weight-bearing joints are the hip, knee, and ankle-foot (the ankle and foot are considered together as one major joint). 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 1.00(H)(2). Surgical arthrodesis is the artificial fusion of the bones that form a joint, essentially eliminating the joint. *Id.* at § 1.00(H)(3). Listing 1.17 is documented by meeting the following A, B, and C criteria:

> A. History of reconstructive surgery or surgical arthrodesis of a major weight-bearing joint.
> AND
> B. Impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months.
> AND

23

> C. A documented medical need (see 1.00C6a) for a walker, bilateral canes, or bilateral crutches (see 1.00C6d) or a wheeled and seated mobility device involving the use of both hands (see 1.00C6e(i)).

20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 1.17.

In this case, the ALJ found that Plaintiff "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the [Listings.]" Tr. 41. For Listing 1.17, the ALJ determined:

> The record does not show a history of reconstructive surgery nor surgical arthrodesis of a major weight bearing joint, nor does it show a documented medical need for a walker, bilateral canes, or bilateral crutches, or a wheeled or seated mobility device involving the use of both hands. For example, see the hip MRI from September 3, 2015 at Exhibit 1F/161 showing mildly decreased articular cartilage and osteophyte in the left hip joint.

Tr. 41-42.

Plaintiff contends there are "surgical and physical therapy records from various of Plaintiff's surgical procedures, including two on his hip in 2016 and 2020." Pl.'s Br. 10. Despite the ALJ's findings at Step Three stating specifically there was no record of reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, the Commissioner asserts that "the ALJ squarely addressed Plaintiff's pre-relevant period and relevant period hip surgeries multiple times in the decision" and found his history of hip surgery and left hip replacement to be severe impairments. Def.'s Br. 8. The Commissioner also argues that in his RFC discussion the ALJ noted Plaintiff's testimony regarding improvement in his symptoms. *Id.* at 9.

It appears, as argued by Plaintiff, that the ALJ erred in his Listing 1.17(A) finding. However, this does not mean that Plaintiff's impairment met the Listing. "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. at 530. It is not enough that the claimant has the diagnosis of a listed impairment; the claimant must also have the findings shown in the listing of that impairment. 20 C.F.R. § 404.1525(d);

*see Bowen v. Yuckert*, 482 U.S. at 146 and n.5 (noting the claimant has the burden of showing that his impairment is presumptively disabling at step three of the sequential evaluation and that the Act requires him to furnish medical evidence regarding his condition). The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. Medical equivalence can be found if the impairment(s) is/are at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 404.1526(a). A claimant must establish that there was a "twelve-month period . . . during which all of the criteria in the Listing of Impairments [were] met." *DeLorme v. Sullivan*, 924 F.2d 841, 847 (9th Cir. 1991) (finding that the claimant's back impairment did not meet the requirements of section 1.05C; remanded on other grounds).

The Commissioner contends "Plaintiff cannot possibly meet all of Listing 1.17's criteria" because "the evidence does not support bilateral cane or crutch use, much less a documented medical need for them during the relevant period." Def.'s Br. at 9-10. The Listings define the phrase "documented medical need," to "mean that there is evidence from a medical source that supports [the claimant's] medical need for an assistive device (see 1.00C2b) for a continuous period of at least 12 months (see 1.00C6a). This evidence must describe any limitation(s) in [the claimant's] upper or lower extremity functioning and the circumstances for which [the claimant] need[s] to use the assistive device." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 1.00(C)(6)(a). A specific prescription in not required. *Id.* As to the Listing 1.17(C) criterion, Plaintiff argues that "there is evidence in the record that Plaintiff's medical providers had determined his need for an assistive device and that he had a cane, rollator, walker, and wheelchair recommended and/or prescribed for him." Pl.'s Br. 10. Plaintiff cites to several pages from the record to support his assertion, including citations to his hearing testimony. *Id.* (citing Tr. 59-61, 101 (hearing testimony); 508, 576, 775, 784, 786, 923, 1001, 1005-

1006 (VA medical and physical therapy records); and 1276 (Dr. Head consultative exam). However, these records do not demonstrate a documented medical need for a walker, bilateral canes, bilateral crutches, or a wheeled and seated mobility device involving the use of both hands as outlined in Listing 1.17(C). For example, records at Tr. 508, 576, 923, and 1005-06 are from 2016 and document Plaintiff's use of a cane or one crutch for ambulation because of a fall risk; records at Tr. 775, 784, and 786 are from 2018 and document Plaintiff's use of a cane and his request for a walker. The record at Tr. 786 notes that Plaintiff requested a consult for a walker, and one doctor reported Plaintiff would benefit from a walker—this does not establish a "documented medical need." Furthermore, the record at Tr. 1276 is from Dr. Head's 2023 report and he indicates that Plaintiff can ambulate without a wheelchair, walker, two canes, or two crutches. In his RFC discussion the ALJ notes that at "one point [Plaintiff] used a roller, but it is not prescribed and consultative examination did not show a requirement for a cane or roller." Tr. 45. There is no information as to how long Plaintiff used the "roller" or any other details regarding its use other than it was not prescribed; however, the listing does not require a prescription for a documented medical need.

While it appears that, based on the record, Plaintiff may not have met all the criteria for Listing 1.17, Fourth Circuit precedent does not permit this court to engage in a broad review of the record evidence in the first instance. *Kyle v. Comm'r, Soc. Sec. Admin.*, No. CV SAG-17-1419, 2018 WL 2013048, at *2 (D. Md. Apr. 30, 2018) (citing *Fox v. Colvin*, 632 F. App'x at 755). It is the ALJ's duty to connect the requirements of the relevant listings to medical findings regarding Plaintiff's impairments. *West v. Comm'r, Soc. Sec.*, No. CV GJH-17-3273, 2018 WL 4292210, at *3 (D. Md. Sept. 7, 2018), *report and recommendation adopted,* No. CV GJH-17-3273, 2018 WL 4863642 (D. Md. Oct. 1, 2018). Accordingly, given the ALJ's erroneous statement regarding Listing 1.17(A) and Plaintiff's argument regarding Listing 1.17(C), the undersigned recommends remand so that the ALJ

may consider all the requirements of Listing 1.17. When "'there is at least conflicting evidence in the record'" as to whether a claimant satisfies a Listing, the ALJ must explain his determination that the claimant's impairment does not meet or equal the listing. *Radford v. Colvin*, 734 F.3d 288, 295-96 (4th Cir. 2013). This requires an ALJ to compare the plaintiff's actual symptoms to the requirements of any relevant listed impairments in more than a "summary way." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).

2.  Remaining Allegations

Plaintiff also argues that ALJ failed to properly consider his non-severe impairments, his after-DLI diagnosis of chronic kidney disease in combination with his hypertension, and his subjective complaints, and the ALJ failed to acknowledge or assign weight to medical opinions in his VA disability rating records. Pl.'s Br. 1. Because the undersigned has determined that the errors in the ALJ's Listings assessment warrant remand, the court declines to further address these remaining claims of error as the ALJ will be able to reconsider and re-evaluate the evidence as part of the reconsideration of this claim. *See Boone v. Barnhart,* 353 F.3d 203, 211 n. 19 (3d Cir. 2003) (remanding on a particular ground and declining to address claimant's additional arguments); *Hancock v. Barnhart*, 206 F. Supp. 2d 757, 763 n.3 (W.D. Va. 2002) (noting the ALJ's prior decision has no preclusive effect, as it is vacated, and the new hearing is conducted de novo). Accordingly, should the district court adopt this recommendation, the ALJ is to also take into consideration Plaintiff's remaining allegations of error on remand.

III.  Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the

undersigned cannot determine that the Commissioner's Listing analysis is supported by substantial evidence.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions, it is recommended that the Commissioner's decision be reversed and remanded for further administrative action as detailed within.

IT IS SO RECOMMENDED.

November 21, 2024                          Kaymani D. West
Florence, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**